IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

```
                                    )
LINDA J. DAVIS                      )
                                    )
        Plaintiff,                  )
                                    )
   vs.                              )   NO. 2:14-CV-220
                                    )
MUNSTER MEDICAL RESEARCH            )
FOUNDATION, INC. d/b/a              )
COMMUNITY HOSPITAL.                 )
                                    )
        Defendant.                  )
```

## OPINION AND ORDER

This matter is before the Court on the "Defendant's Motion for Summary Judgment," filed by Defendant Munster Medical Research Foundation d/b/a Community Hospital ("Hospital") on February 19, 2016 (DE #67), "Defendant's Motion to Strike Portions of Plaintiff's Evidence, Statement of Genuine Disputes and Plaintiff's Affidavit from Plaintiff's Response to Defendant's Motion for Summary Judgment," filed on August 19, 2016 (DE #91), "Defendant's Motion to Strike Portions of Plaintiff's Evidence based upon Failure to Disclose during Discovery," filed on August 19, 2016 (DE #93), and "Stipulated Motion to Apply the Legal Standards Set Forth in *Ortiz vs. Werner* to the Parties' Pending Summary Judgment Pleadings and Evidence," filed by both parties on September 14, 2016 (DE #98). For the reasons set forth below, Defendant's Motion for Summary Judgment (DE #67) is **GRANTED IN**

**PART** and **DENIED IN PART,** Defendant's Motion to Strike (DE #91) is **DENIED**, Defendant's Motion to Strike (DE #93) is **GRANTED IN PART** and **DENIED IN PART,** and the "Stipulated Motion to Apply the Legal Standards Set Forth in *Ortiz vs. Werner* to the Parties' Pending Summary Judgment Pleadings and Evidence" (DE #98) is **GRANTED.** Count II of the First Amended Complaint is hereby **DISMISSED.**


BACKGROUND

Plaintiff Linda J. Davis ("Davis") had been employed by the Hospital as a security officer for more than a decade when she took FMLA leave for knee surgery in 2013.  When she returned to work, she was informed that her usual position in the Hospital had been assigned to another security officer.  The Hospital allegedly assigned her to a different position that required more walking, as well as pushing and lifting.  The increased walking allegedly caused Davis's knee to swell.  Davis requested to be returned to her pre-FMLA leave position, which the Hospital denied.

Davis filed this action against the Hospital, asserting that the Hospital violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*  Her First Amended Complaint ("Complaint") alleges three causes of action:  Count I - FMLA interference and retaliation; Count II - ADA failure to accommodate; and Count III - ADA retaliation.  (DE #36.)  The

Hospital denies that it violated the FMLA or the ADA.  The Hospital
filed the instant motion for summary judgment and two motions to
strike portions of the evidence Davis submitted in response to the
Hospital's summary judgment motion.  The motions have been fully
briefed and are ripe for adjudication.  The parties also jointly
filed the "Stipulated Motion to Apply the Legal Standards Set Forth
in *Ortiz vs. Werner* to the Parties' Pending Summary Judgment
Pleadings and Evidence," which the Court will address below.

DISCUSSION

Motions to Strike

The Hospital's first motion to strike urges the Court to
strike portions of Davis's evidence based on her alleged failure
to disclose them during discovery.  (DE #93.)  The Hospital had
propounded an interrogatory to Davis seeking information regarding
"every unfavorable or adverse employment action which affected the
terms or conditions of [her] employment that [she] suffered or
experienced due to [the Hospital's] action or conduct."  (DE #94-
1 at 7.)  Davis answered this interrogatory by identifying five
allegedly adverse employment actions.  (*Id*. at 8-9.)  She confirmed
that her answer to this interrogatory was complete during her
deposition, and never supplemented this interrogatory answer.  The
Hospital contends that Davis's response brief to its motion for

summary judgment raises new issues and evidence not previously disclosed by Davis.

Federal Rule of Civil Procedure 26(e) provides that a party who has responded to an interrogatory must supplement or correct its response "in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). If a party fails to provide information as required by Rule 26(e), "the party is not allowed to use that information . . . to supply evidence on a motion, . . . unless the failure was substantially justified or is harmless." Fed R. Civ. P. 37(c)(1). "The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (citation omitted). The Court considers the following factors to determine whether the failure was substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Westefer v. Snyder,* 422 F.3d 570, 584 n.21 (7th Cir. 2005) (citation omitted). Here, there is no indication that

Davis acted willfully or in bad faith, and this litigation is not at the trial stage.[1]  Thus, the Court's inquiry focuses on the prejudice to the Hospital.

The Hospital argues that it relied upon Davis's interrogatory answer in preparing its summary judgment motion, and thus, is unduly prejudiced by the following evidence Davis disclosed in her response to that motion:

1. Davis's receipt of attendance points for absenteeism, and statements made by the Director of the Security Department, David Heard ("Heard"), regarding same.

2. Davis was allegedly told to hand over her computer pass code to a co-worker, then was nearly written up for handing over her pass code.

3. Heard's alleged admonishment to the Security Department and Davis that they are not to go to Human Resources for problems, and that Davis was almost written up for standing down on a call.

4. Heard allegedly prevented Davis from seeing her personnel file and his alleged comments regarding same.

5. Davis's allegations of being under "increased scrutiny" and being "disciplined for things she had been allowed to do," aside from the adverse employment actions that she disclosed prior to the close of discovery.

Davis does not deny that she failed to supplement her interrogatory answer or disclose these actions during her deposition.  However,

---

[1]In its reply brief, the Hospital asserts that Davis acted willfully or in bad faith because she claims to be justified in not disclosing evidence that she did not know was material until her current counsel prepared her response to the Hospital's summary judgment motion.  The Court does not agree that this demonstrates bad faith or willfulness because Davis was represented by different counsel during discovery.  Davis's prior counsel withdrew his appearance after discovery closed.  (DE #62.)  Davis's current counsel filed her appearance two months after the Hospital filed its motion for summary judgment, and subsequently filed Davis's response to that motion.  (DE ##70, 81.)

the first of these actions was disclosed to the Hospital prior to the close of discovery. The Hospital's Statement of Material Facts in support of its motion for summary judgment acknowledges that Davis identified her February 17, 2014, Problem Solving Request Form "addressing the assessment of two attendance points for calling off of work" as a report, complaint or communication she made to the Hospital regarding occurrences of discrimination, retaliation or unlawful conduct. (DE #69-1 at 4 (citing DE #69-4 at 6-7 (Davis's interrog. answer no. 7).) Because Davis disclosed this action prior to the close of discovery, the Court **DENIES** the Hospital's motion to strike it.

As to the four other actions, Davis attempts to justify their late disclosure by asserting that she first learned that these actions were material when she went through the summary judgment process with her current counsel. She insists that her failure to remember to disclose these actions during her deposition demonstrates that she is not an attorney and is not familiar with what constitutes an adverse employment action under Federal law. However, "[a] misunderstanding of the law does not equate to a substantial justification for failing to comply with the disclosure deadline." *Musser,* 356 F.3d at 758. Davis argues that the Hospital is not prejudiced because it still employs nearly all of the individuals identified in the Davis Affidavit and has full access to people who can corroborate or deny her allegations. She

suggests that the Hospital may ask her at trial about how she learned of the materiality of the newly disclosed actions, *i.e.,* when her new counsel was preparing her response to its summary judgment motion.

"Motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party." *The Cincinnati Ins. Co. v. Lennox Industs., Inc.,* No. 3:14-CV-1731, 2016 WL 495600, at *4 (N.D. Ind. Feb. 9, 2016) (citing *Kuntzman v. Wal-Mart*, 673 F. Supp. 2d 690, 695 (N.D. Ind. 2009), and *Gaskin v. Sharp Elec*. *Corp.,* No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007)). The Court agrees that the Hospital would be unduly prejudiced by allowing Davis to rely on adverse employment actions first disclosed in response to the Hospital's summary judgment motion. Davis's late disclosure prevented the Hospital from having a full and fair opportunity to investigate or seek additional discovery relative to these actions. Even if Davis did not learn of the materiality of these alleged adverse employment actions until reaching the summary judgment stage of litigation, she unduly surprised the Hospital by simply presenting evidence of these actions along with her opposition to summary judgment. Davis's suggestion of allowing the Hospital to question Davis at trial about when she learned of the materiality of these events does nothing to cure the prejudice caused by the late disclosure. The

Court therefore **GRANTS** the Hospital's motion to strike references to the four alleged adverse employment actions because they were not disclosed during discovery.

The Hospital also maintains that it was prejudiced by the following allegations:

> 1. Davis allegedly was not reinstated to her post-FMLA leave position or an equivalent position upon her return from leave in February 2013.
>
> 2. The Hospital allegedly failed to make a reasonable accommodation as to Davis's purported disability.
>
> 3. The Hospital allegedly failed to engage in an interactive process with Davis to determine accommodations.

As noted above, Rule 26(e) is violated where the information "has not otherwise been made known to the other parties during the discovery process or in writing." These first two allegations form the basis of Davis's FMLA and ADA claims against the Hospital. The Complaint asserts that (1) the Hospital assigned Davis to a different position after her FMLA leave for knee surgery, (2) her new position required walking, pushing, and lifting, which caused her knee to swell, and (3) the Hospital denied her request for reassignment. (*See* DE #36 (Compl. ¶¶ 7, 10-14, 19, 27).) In its summary judgment briefing, the Hospital proffers evidence explaining the positions assigned to Davis and reasons therefore (*see, e.g.,* DE #69-1 at 81-82, 87-89), as well as evidence of the Hospital's efforts to reasonably accommodate Davis (*see, e.g.,* *id.* at 88 (Heard Aff. ¶67)). Thus, the Hospital was aware of these

allegations before the close of discovery.  The third allegation is an element of proof of Davis's failure to accommodate claim. *See E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005) ("the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation"). The Hospital should not be surprised that Davis made these three allegations in response to its motion for summary judgment.  And while Davis has made these allegations, she must support them with evidence in order to survive summary judgment.  *See Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) ("summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").  The Court finds that the Hospital was not unduly prejudiced by these three allegations, and therefore, **DENIES** the motion to strike them from Davis's response brief.

The Hospital's second motion seeks to strike portions of the Affidavit of Linda J. Davis ("Davis Affidavit") (DE #81-3), portions of Davis's Statement of Genuine Disputes (DE #81-2), and three exhibits to Davis's Statement of Genuine Disputes.  (DE #91.) The Court will address the exhibits at issue first.

The Hospital moves to strike Davis's Exhibits 3, 5 and 7. (DE #81-4, DE #81-6, DE #81-8.)  Each of these exhibits is a "Memorandum to File" purportedly prepared by EEOC Investigator

J.R. Andrews in connection with an onsite visit to the Hospital on March 19, 2014. Exhibit 4 describes Andrews's interview of Michael Graham ("Graham"), the Hospital's former Human Resources Director. Exhibit 5 describes Andrews's interview of Dave Slacian, the Hospital's Security Supervisor. Exhibit 7 describes Andrews's interview of Heard, the Hospital's Director of Security. None of the memoranda are signed or verified by Andrews.

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Thus, the Rules "allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). The Hospital relies upon *Stolarczyk ex rel. Estate of Stolarczyk v. Senator International Freight Forwarding, LLC,* 376 F. Supp. 2d 834 (N.D. Ill. 2005), in which the court held that an "EEOC charge and notes of the interview with [an interviewee] constitute inadmissible hearsay that is not properly considered in the summary judgment analysis, g*iven the fact that [interviewee] would be unavailable as a witness at trial and was never deposed in this case.*" *Id*. at 838 (emphasis added). In that case, the interviewee had died before providing sworn testimony in a deposition or at trial. Here, in contrast, there is no indication that Andrews, Graham, Slacian, or Heard will be

unavailable as witnesses at trial.  Indeed, the Hospital proffers affidavits from Graham, Slacian, and Heard in support of its motion for summary judgment.  (*See* DE #69-1 at 42-54, 61-65, 77-94.)  As such, the facts set forth in Exhibits 3, 5, and 7 could later be presented in an admissible form.  Therefore, the motion to strike Davis's exhibits is **DENIED**.

The Hospital argues that portions of the Davis Affidavit and Statement of Genuine Disputes contain hearsay, are not based on personal knowledge, and are speculative.  Davis responds that the Hospital has failed to analyze whether any of the statements were offered "to prove the truth of the matter asserted," as required to exclude them as hearsay.  Fed. R. Evid. 801(c)(2).  Regarding her alleged lack of personal knowledge, Davis argues that the statements at issue can be presented in an admissible form at trial, as allowed by Rule 56(c)(2), through the live testimony of Davis and other individuals identified in the Davis Affidavit.  The Hospital disputes Davis's arguments.

The Court has reviewed the Davis Affidavit and Statement of Genuine Disputes in their entirety.  It is the function of the Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement.  *Wajvoda v. Menard, Inc.*, No. 2:11-CV-393, 2015 WL 5773648, at *3 (N.D. Ind. Sept. 30,

2015); *see, e.g., S.E.C. v. KPMG LLP,* 412 F. Supp. 2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.,* No. 04 C 5167, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006). When ruling on the motion for summary judgment, the Court is capable of sifting through the evidence and considering it under the applicable federal rules and case law, giving each statement the credit to which it is due. Therefore, the Hospital's motion to strike portions of the Davis Affidavit and Statement of Genuine Disputes is **DENIED** as unnecessary.


Stipulated Motion

In connection with Davis's FMLA retaliation claim, Davis initially argued that a "convincing mosaic of circumstantial evidence" would permit a reasonable trier of fact to infer retaliation by the Hospital. (DE #81 at 8-9.) After the parties had fully briefed the Hospital's motion for summary judgment, the Seventh Circuit held that "'convincing mosaic' is not a legal test" in an employment discrimination claim. *Ortiz v. Werner Enters., Inc.,* No. 15-2574, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016). Rather, the legal standard to be applied "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole." *Id*. at *4.

On September 14, 2016, the Hospital and Davis jointly submitted a "stipulated motion" asking the Court to apply the legal standards set forth in *Ortiz* to the parties' pending summary judgment pleadings and evidence. (DE #98.) The parties "stipulate[d] that the legal authority and standards set forth in *Ortiz* shall apply to the within filed Summary Judgment pleadings as if set forth therein and same shall be incorporated into and made a part of the parties' Summary Judgment pleadings by reference pursuant to this Stipulated Motion." (*Id.* ¶8.) The parties also agreed that their summary judgment pleadings "shall not be modified except to the extent of the court's application of law and legal standards set forth in the *Ortiz* decision." (*Id.* ¶9.) This motion makes no effort to apply the facts of this case to the legal standard set forth in *Ortiz*. The Court has reviewed the parties' summary judgment pleadings and evidence, and accepts their stipulations. The parties' Stipulated Motion (DE #98) is **GRANTED**. The Court will disregard the parties' references to the "convincing mosaic" theory, and instead, will apply the legal standards set forth in *Ortiz*, as incorporated by stipulation into the parties' summary judgment briefs.

## Motion for Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

A party opposing a properly supported summary judgment motion may not rely on allegations in her own pleading but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). If the nonmoving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). The Court "'appl[ies] the summary judgment standard

with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility.'" *Bob–Maunuel v. Chipotle Mexican Grill, Inc.*, 10 F. Supp. 3d 854, 873 (N.D. Ill. 2014) (quoting *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002)).

Facts

In 2004, Davis was hired as a Security Officer ("Officer") by the Hospital, an acute care hospital facility in Munster, Indiana. Davis's job as an Officer included several job functions: (1) providing a proactive visible deterrent to crime and to respond to disturbances and take appropriate action; (2) apprehending violent offenders and assisting staff with restraining patients; (3) walking patrols of the interior and exterior of the Hospital; (4) assisting in evacuating, lifting, and moving patients; and (5) responding to violent situations.

Officers are assigned to specific positions at the Hospital, each of which is designated a number. Before 2013, Davis worked mostly – but not exclusively – in position 15, which is a "seated position" located in the Hospital. Position 15 requires an Officer to sit for half of the time and walk for half the time around the area and into the adjacent parking building. Other seated positions include positions 5, 6 and 7, which are located in the Hospital and require an Officer to sit for approximately two-

thirds of the time, and walk around the area for one-third of the time.   Positions 8 and B2 are "relief positions" whereby the Officer walks through the Hospital inspecting various areas and also relieves other Officers while they are on break.   Position 8 requires transporting bodies to the morgue, and can involve exposing Officers to combative patients and guests.   The Command Center position consists of sitting in a room watching security camera feeds and answering the Security Department telephone.

Davis attests that Officers generally worked at the same positions the majority of the time.   In addition to her own experience, Davis identifies Officers who worked in particular positions for time spans ranging from two to twelve years.   (DE #81-3 at ¶34.)   The Hospital maintains that no specific position is guaranteed to an Officer and that scheduling is based upon the needs of the Security Department.

Davis's Medical Issues and 2013 FMLA Leave

Beginning in 2008, Davis developed problems in her knees. She was diagnosed with medial meniscus tears and patella femoral articular damage.   She developed a limp, had problems with swelling, stiffness, and getting out of chairs, and was in pain. Davis had arthroscopic surgery on her knees in 2008, but the surgery did not help her pain.   Davis requested several FMLA leaves of absence over time, all of which were granted by the Hospital.

At issue in this case is Davis's FMLA leave from January 10, 2013, to February 27, 2013, during which she had a second arthroscopic surgery on her knee ("2013 FMLA leave"). Davis expected to be assigned to position 15 when she returned from her 2013 FMLA leave, as she had after other FMLA leaves. However, the Hospital had assigned position 15 to another Officer. Director of Security Heard attests that he assigned Officer Major Higgins to position 15 due to his age (78 years), diminished eyesight for driving, and his desire to be indoors during the winter. (DE #69-1 at 91-92.) Officer Higgins had previously been assigned to driving security vehicles. Heard attests that he believed that position 15 would be better for Officer Higgins, without any intent of harming Davis. (*Id.*)

Upon returning to work in February 2013, Davis provided a note from her doctor stating that she was "[s]ufficiently recovered to resume a normal workload" on February 27, 2013. (DE #69-4 at 47.) Davis also submitted a fitness for duty certificate dated February 27, 2013, indicating that she was "able to perform all the functions of his/her job." (*Id.* at 49.) Davis testified that before her doctor released her to return to work, he asked her about her job and what she was doing in that position. (DE #69-3 at 39-40.)

Davis's Work Schedule After 2013 FMLA Leave

When Davis returned to work after her 2013 FMLA leave, the Hospital assigned Davis to relief positions 8 and B2 for her first two days at work. Davis worked in those positions, though her knee started swelling due to the walking required in position 8. Working in position B2 caused Davis no concern, or pain or problem with her knees. (DE #69-3 at 196-97.) Davis repeatedly complained to Heard about her swollen knee and asked him if she could be reassigned to position 15. Davis attests that Heard told her that she could not work if she had any restrictions. (DE #81-3 at ¶15.) She attests that on the second or third day after she returned from FMLA leave, Heard suggested that she be assigned to the Command Center position, and she agreed, but the position never materialized. (*Id*. at ¶13.) Davis was assigned to a seated position for the first week of March 2013. On March 6, 2013, Davis participated in an accommodation conference with Heard and Human Resources Director Graham. At that meeting, Davis confirmed that she was able to work without restrictions and could perform her essential job functions. Davis requested reassignment to position 15 or another position that would not aggravate her still-healing knee.

After the March 6 accommodation meeting, Davis was assigned to seated positions in March and April. (DE #81-5 at 4-5.) In April 2013, Davis applied for and was granted intermittent FMLA

-18-

leave.   Davis was assigned to seated positions for most of May 2013, with the exception of four days at relief position B2.   (*Id.* at 6.)   As before, working in position B2 caused Davis no concern, pain or problem with her knees. (DE #69-3 at 197.)   In June 2013, she was assigned to seated positions, with the exception of one day at relief position B2.   (DE #81-5 at 7.)

In July 2013, Davis was assigned to seated positions, with the exception of one day at relief position 8 on July 11, 2013. (*Id.* at 9.)   Davis testified that working in position 8 on that day was "not as bad," because she was able go to a post and relieve someone at that post.   (DE #69-3 at 198.)   Davis provided the Hospital with a physician's note dated July 24, 2013, stating that Davis "needs [a] table to keep her limited, to keep her feet on the floor." (DE #69-5 at 3.)   The note did not indicate that she had a walking restriction, and Davis never submitted a physician's note indicating that she needed to elevate her leg.   (DE #69-3 at 192.)   A fitness for duty certificate dated July 25, 2013, limited Davis's walking, bending and reaching to less than one hour, and stated that she must "keep feet flat on the floor while sitting down with adequate room for knees while bending." (DE #81-10.) The Hospital held an accommodation meeting on July 25, 2013, at which Davis requested a desk and chair at her seated positions. The Hospital agreed and replaced the stools and podiums at positions 5 and 6 with chairs and desks.   After the accommodation

meeting, Davis was not assigned to positions 5 and 6 until the chairs and desks were in place.   Positions 7 and 15 always had chairs and desks.   In 2013, Davis worked 196 shifts in seated positions, three shifts in position 8, and six shifts in position B2.

In 2014, Davis worked 137 shifts in seated positions and 19 shifts in position 8.   Davis requested and received FMLA leave in August 2014, during which she underwent knee replacement surgery. In anticipation of Davis's return to work, the Hospital held another accommodation conference on January 9, 2015.   Davis provided the Hospital with a doctor's note indicating that she was able to return to work on January 12, 2015, with "no crawling, no climbing, no lifting [over] 50 [pounds], limited walking per [patient] tolerance." (DE #69-5 at 6.)   The Hospital agreed that Davis could avoid assignment to relief positions, would be assigned to seated positions, and would not need to respond to altercations, walk for more than a half-hour, crawl, climb, or lift heavy objects. (DE #69-1 at 38-39.)   When Davis returned to work, she was assigned to relief position 8, but was told she could work at a seated position.   She worked in position 8 for part of the day, then switched to a seated position.   In 2015, Davis worked 187 shifts in seated positions and one shift in position 8.

Corrective Actions, EEOC Charge, and Problem Solving Requests

Prior to her 2013 FMLA leave, Davis had never received a Corrective Action.  On March 18, 2013, Davis received her first Corrective Action for secretly recording her March 6, 2013 accommodation meeting with Heard and Graham ("March 2013 Corrective Action").  Davis secretly recorded this meeting because she wanted to record Heard saying that he would not let her work if she had restrictions.  (DE #81-3 at ¶17.)  Davis admits that she secretly recorded this meeting, and that she later lied by telling Graham that she had not recorded the meeting.  The Hospital's Corrective Action Policy states that falsifying any verbal or written statement and recording conversations without supervisory approval and the prior approval of conversation participants are offenses requiring corrective action.  Davis attests that Graham told her that he had no problems with her recording the meeting, but that he probably would have to issue a Corrective Action because Heard was upset about it.  (*Id.* at ¶20.) This Corrective Action did not result in a suspension for Davis.

On June 21, 2013, Davis received her second Corrective Action for leaving her post for eight minutes and using a personal laptop computer ("June 2013 Corrective Action").  On June 18, 2013, the Command Center received an anonymous call that no Officer was on duty at position 7.  The Hospital's surveillance camera recorded Davis using her laptop computer in a visitor area 15 feet away

from her post for 43 minutes.  When Davis asked another Officer on duty to leave position 7, the post was left unoccupied for eight minutes.  Hospital policy provided that outside laptop computers are not allowed on Hospital property, and disciplinary actions would be given to Officers who use outside laptops during their work shift.  Davis received a three-day suspension for violating the Hospital's policy on electronic devices and failing to be at her post for eight minutes.

Davis testified that she had understood that Officers could use laptop computers during lunch and breaks.  (DE #69-3 at 119-20.)  Davis attests that she regularly saw other Officers use their laptops and other electronic devices at work, which caused her to believe that using a laptop at work was not against the rules.  (DE #81-3 at ¶29.)  She allegedly witnessed Officer Charlie Walker using a portable DVD player to watch movies at his post in 2011 and 2012, and recalls seeing Heard speaking with Officer Walker at this post while a movie was playing.  Davis attests that soon after she returned from her 2013 FMLA leave, supervising Officer Dan Belzinski saw Davis with her laptop computer in its case at her post, and told her "don't worry about" having it at work.  (*Id*. at ¶31.)  Based on his assurances, Davis spent her break that day using her laptop computer in the visitor area near her post. Several months later, Davis received the June 2013 Corrective

Action for using her laptop computer while sitting in that same area.

Davis also maintains that Officers are allowed to leave their posts without repercussions. She notes that Officers are allowed to leave their posts to use the restroom without obtaining permission or someone to relieve them temporarily. Davis attests that she once heard over the radio that Officers Walker and Jenkins left their posts when Officer Walker's vehicle was in the process of being stolen.

On June 28, 2013, Davis submitted a Problem Solving Request Form to the Hospital's Human Resources Department seeking to have the March 2013 Corrective Action and the June 2013 Corrective Action removed, and to be paid for her three-day suspension. After a meeting between Davis and the Human Resources Department, the Hospital upheld her suspension, but noted that Graham was asked to further review her accommodation to position 15. (DE #69-4 at 35.) On July 19, 2013, Davis filed an EEOC charge against the Hospital asserting that it failed to accommodate her after her 2013 FMLA leave in violation of the ADA. Davis amended the EEOC charge against the Hospital on November 5, 2013.

On February 17, 2014, Davis submitted a Problem Solving Request Form regarding two attendance points assessed against Davis for absenteeism. Davis maintains that she had requested and received paid time off ("PTO") from a supervisor for the days she

was not at work.   When Davis realized that she had been assessed attendance points for those PTO days, she was directed by the Human Resources Department to ask Heard about it.   When Davis asked Heard why she received the attendance points, Heard allegedly responded, "I told you to stay out of H.R.   You've been warned. . . .   You've been warned for the last time."   (DE #81-3 at ¶¶44-45; DE #69-3 at 156.)   Heard attests that he had assessed the attendance points without knowing that Davis had received supervisor approval for PTO.   (DE #69-1 at 92 (Heard Aff. ¶88).)   Once he realized his mistake, the points were removed from Davis's record.   (*Id.*)   Heard denies threatening or intimidating Davis.   (*Id.* (Heard Aff. ¶89).)

Davis received only a 1% merit increase based her performance evaluation dated February 19, 2014, which referenced the two Corrective Actions she received in 2013, and indicated that Davis needed improvement in the category of "Dignity."   (DE #69-5 at 50-54; *see* DE #69-1 at 85 (Heard Aff. ¶50).)   Davis received a 2% merit increase based on her performance evaluation dated February 16, 2015.   She continues to be employed by the Hospital as an Officer.

Analysis

FMLA Claim - Interference

Count I of the Complaint alleges that the Hospital discriminated against Davis for exercising her FMLA rights.   To

-24-

prove an FMLA interference claim, a plaintiff must show that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) her employer improperly denied benefits to which she was entitled. *Ryl–Kuchar v. Care Ctrs., Inc.,* 565 F.3d 1027, 1030 (7th Cir. 2009). The parties do not contest that Davis was an eligible employee under the FMLA, that the Hospital is covered by the FMLA, that Davis was entitled to FMLA leave, or that she provided sufficient notice of her intent to take leave. The only issue is whether the Hospital improperly denied benefits to which Davis was entitled.

The Hospital maintains that it did not deny FMLA benefits to Davis because it always granted Davis's requests for FMLA leave. But "the ways in which an employer may interfere with FMLA benefits are not limited simply to the denial of leave. Interference also encompasses 'us[ing] the taking of FMLA leave as a negative factor in employment actions' and 'discouraging an employee from using such leave.'" *Preddie v. Bartholomew Consolidated Sch. Corp.,* 799 F.3d 806, 818 (7th Cir. 2015) (quoting 29 C.F.R. § 825.220(c), (b)). Upon returning from FMLA leave, an employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). "An employee

is entitled to such reinstatement even if the employee has been replaced or . . . her position has been restructured to accommodate the employee's absence." 29 C.F.R. § 825.214. However, the right to reinstatement is not absolute; the employee must establish she is entitled to the benefit she claims. *Kohls v. Beverly Enters. Wisc., Inc.,* 259 F.3d 799, 804 (7th Cir. 2001). Once she has done so, "[t]he employer may then present evidence to show that the employee would not have been entitled to her position even if she had not taken leave." *Id.*

It is undisputed that Davis was entitled to reinstatement to the position of Officer upon returning from her 2013 FMLA leave, and that the Hospital reinstated Davis as an Officer with the same benefits and pay. Davis argues that the Hospital violated FMLA by failing to assign her to the same position that she had worked as an Officer prior to her 2013 FMLA leave, or an equivalent position. Under the FMLA, an employee "is ordinarily entitled to return to the same shift or the same or an equivalent work schedule." 29 C.F.R. § 825.215(e)(2). An equivalent position "must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a). The equivalency requirement "does not extend to *de minimus*, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f).

Davis relies upon *Breneisen v. Motorola, Inc.,* 512 F.3d 972 (7th Cir. 2008), to assert that genuine issues of material fact exist as to whether the Hospital violated FMLA by failing to assigned Davis to her pre-FMLA leave position or an equivalent position. In *Breneisen*, the plaintiff was reassigned to a new position after returning from FLMA leave. The Seventh Circuit held that the plaintiff had provided sufficient evidence that the new position was not equivalent to the plaintiff's pre-FMLA leave position to avoid summary judgment. *Id.* at 977. While both positions provided the same pay and benefits, they had different responsibilities. *Id.* The plaintiff's prior position involved administrative functions, while his new position involved manual tasks and had less prestige and visibility. *Id.* The plaintiff also proffered sufficient evidence that his position would not have been eliminated if he had not taken leave. *Id.* at 978.

It is undisputed that Davis worked mostly at position 15 before her 2013 FMLA leave, and that she was not assigned to position 15 upon returning from her 2013 FMLA leave. Davis contends that the positions to which Davis was assigned after her 2013 FMLA leave differed materially from position 15. As an Officer, Davis's responsibilities included walking patrols of the interior and exterior of the Hospital; assisting in evacuating, lifting, and moving patients; and responding to violent situations. While these responsibilities apply to all Officers,

the evidence suggests that an Officer working in a particular position may be called upon to fulfill certain responsibilities more often. Position 15 is limited to 50% walking, and does not include transporting bodies to the morgue or exposure to combative patients and guests. Davis asserts that the Command Center position is "[t]he only post that is arguably equivalent in terms of benefits, pay, and terms and conditions of employment" to position 15. (DE #81 at 7.) Heard allegedly offered Davis the Command Center position after her 2013 FMLA leave, the position never materialized. Instead, Davis was assigned to position 8, which was a relief position that involved walking, transporting bodies to the morgue, and possible exposure to combative patients and guests. Davis contends that position 15 was so markedly different from other positions that the Hospital assigned Officer Higgins to it to accommodate his advanced age and deteriorating eyesight.

The Hospital maintains that Davis had the same or substantially similar duties and responsibilities upon returning from her 2013 FMLA leave. It asserts that because Davis was not called upon to fulfill the particular duties required of position 8, her duties were substantially similar in position 15 and position 8. Davis identifies no incidents in which she had to deal with a combative patient or guest, and did not recall any incidents in which she was asked to transport a body in 2013 or

2014.  (DE #69-3 at 142-43.)  Davis testified that if she felt that she should not have been pushing a wheelchair or anything else, she did not push it.  (*Id.* at 144.)  The Hospital notes that Davis was also assigned to seated positions 5, 6, and 7, which require less walking than position 15.  Considering the evidence in the light most favorable to Davis, the Court finds that genuine issues of material fact exist as to whether the positions assigned to Davis after her 2013 FMLA leave were substantially similar to her pre-FMLA leave position.  *See Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 766-67 (5th Cir. 2001) (finding questions of fact precluded summary judgment as to job equivalency when nurse who was assigned to work day shifts returned from FMLA leave and was offered a night shift position), *abrogated on other grounds by Burlington Northern & Santa Fe Railway v. White,* 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

Davis maintains that the Hospital offers no evidence that it assigned Officer Higgins to position 15 for any reason other than to cover for Davis's absence, or that it would have reassigned Davis to another position and assigned Officer Higgins to position 15 even if Davis had not taken FMLA leave.  The Hospital presents evidence that it assigns positions based on the needs of the Security Department and the availability of staff, and that Heard assigned Officer Higgins to position 15 because of his advanced age and diminishing eyesight.  Heard attests that this decision

was made without regard to Davis's medical condition or FMLA leave. The Hospital does not address whether it would have reassigned Davis to another position in order to assign Officer Higgins to position 15, even if Davis had not taken FLMA leave.

Davis contends that an issue of fact exists as to whether Officers were assigned to new positions "absent something strange." (DE #81 at 6.) The Court agrees. The Hospital does not deny that it had a general practice of assigning Officers to the same positions for years, but contends that Officers may be scheduled to work in any position and are not guaranteed a specific position. Davis does not contest that Officers have no right to a particular position, but maintains that Officers generally hold their assigned positions for years. Davis proffers her own experience of being assigned mostly to position 15 for five years, even after returning from other FMLA leaves. She also witnessed other Officers being assigned to the same positions for several years. The Court finds that genuine issues of material fact exist as to whether Davis was entitled to return to position 15 or an equivalent position after her 2013 FMLA leave. *See Hunt*, 277 F.3d at 766 (questions of fact precluded summary judgment where "although the Medical Center did not formally hire nurses for particular shifts, the routine practice was to hire nurses to work only on specific shifts" and plaintiff had been working as a designated day shift nurse for several years). A reasonable

inference can be drawn that Davis would not have been reassigned absent her taking FMLA leave, making summary judgment on this point inappropriate.

FMLA Claim – Retaliation

Count I of the Complaint also alleges that the Hospital retaliated against Davis in violation of the FMLA. The FMLA "makes it unlawful for an employer to retaliate against an employee who exercises his FMLA rights." *Carter v. Chicago State Univ.,* 778 F.3d 651, 657 (7th Cir. 2015). A plaintiff may proceed under the direct or indirect methods of proof when attempting to establish an FMLA retaliation claim. Under the direct method, the only method Davis asserts, "a plaintiff must establish that 1) he engaged in a protected activity; 2) his employer took an adverse action against him; and 3) there is a causal connection between his protected activity and his employer's adverse employment action." *Cracco v. Vitran Express, Inc.,* 559 F.3d 625, 633 (7th Cir. 2009). The Seventh Circuit recently explained that the legal standard to be applied "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 2016 WL 4411434, at *4.

Davis maintains that the Hospital retaliated against her by reassigning her from position 15 to a position that required "a lot of walking, transporting bodies, running errands, and walking to different posts to relieve other Security Officers," *i.e.,* position 8.  (DE #81 at 8.)  "A schedule change may constitute a materially adverse action when there is evidence that the defendant sought to exploit a 'known vulnerability' by altering a plaintiff's work schedule upon return from FMLA leave." *Wink v. Miller Compressing Co.,* No. 14-CV-367, 2015 WL 3454220, at *7 (E.D. Wis. June 1, 2015) (citing *Langenbach v. Wal-Mart Stores, Inc.,* 761 F.3d 792, 799 (7th Cir. 2014) and *Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).  It is undisputed that Heard knew that Davis was recovering from knee surgery upon returning from her 2013 FMLA leave.  According to Davis, Heard exploited this "known vulnerability" by assigning her to position 8, which required her to walk around the Hospital and caused her knee to swell.

The Court finds that a genuine issues of fact exist as to whether Davis's reassignment was a materially adverse action.  As explained above, an employee is "ordinarily entitled to return to the same shift or the same or an equivalent work schedule." 29 C.F.R. § 825.215(e)(2).  Prior to her 2013 FMLA leave, Davis was assigned mostly to position 15.  Upon returning from FMLA leave, Davis was reassigned to relief positions 8 and B2, and several

seated positions in 2013.  Considering the evidence in the light most favorable to Davis, the possibility of being reassigned to a different position could dissuade a reasonable employee from exercising her rights under the FMLA.

Davis must also prove a causal connection between the adverse employment action and her FMLA leave.  Davis attempts to do so by arguing that two Corrective Actions demonstrate that she was treated differently from similarly-situated Officers.  She asserts that she received the March 2013 Corrective Action for secretly recording her meeting with Heard and Graham despite the fact that Graham subsequently told her that he had no objection to the recording.  She infers that because Graham had no objection, she should not have received the Corrective Action, though she admits that Heard "was furious" about being recorded.  (DE #81-3 at ¶20.) Hospital responds that this Corrective Action was clearly warranted.  Davis admitted that she secretly recorded the meeting, and that she later lied by telling Graham that she had not recorded the meeting, in violation of Hospital policy.  Davis does not offer evidence of any other Officer who secretly recorded a meeting, or lied about doing so.

Davis also relies upon her June 2013 Corrective Action for being away from her post and using her laptop computer at work in violation of Hospital policy.  Davis maintains that other Officers were allowed to leave their posts without repercussions.  She notes

that Officers leave their posts to use the restroom, and that two Officers once left their posts when an Officer's vehicle was being stolen. Davis had also allegedly received assurances from supervising Officer Belzinski that she should not worry about having her laptop computer at work, and witnessed other Officers using laptop computers and other electronic devices at work.

In response, the Hospital argues that the Officers identified by Davis are not directly comparable to her. But more fundamentally, Davis must show that the comparable Officers did not take FMLA leave. *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006) (affirming summary judgment on FMLA retaliation claim where "Hull fails to present any evidence on the critical independent variable here: FMLA leave (*i.e.,* which comparators did (or did not) take FMLA leave)"); *see also Langenbach,* 761 F.3d at 803 (the similarly-situated analysis under the direct method "is substantially the same as the analysis under the indirect method"). Davis makes no effort to establish that at least one of the other Officers "is directly comparable to [her] *and* did not take FMLA leave." *Hull*, 445 F.3d at 952 (emphasis in original). Thus, although the evidence presented by Davis may establish that she was punished with greater severity than other Officers for violating Hospital policy, it does not establish a similarly situated comparator group.

Davis cites *Benuzzi v. Board of Education of the City of Chicago*, 647 F.3d 652 (7th Cir. 2011), for the proposition that a reasonable jury could find that these Corrective Actions have the power to dissuade a reasonable employee from pursuing her rights. In *Benuzzi*, the Seventh Circuit held that a "sweeping Notice of Disciplinary Action citing petty misdeeds that allegedly occurred months ago" and a memorandum restricting the plaintiff's hours at work, which were given to the plaintiff the day after she gave her deposition, "could constitute an adverse action within the meaning of the direct method of proving retaliation." 647 F.3d at 665 (citation omitted). The court explained that a "reasonable employee could be deterred from filing a discrimination complaint or participating in a deposition if doing so would be followed by the (highly probable) possibility of discipline for activities he may have long forgotten and the limitation of his ability to be present at his workplace." *Id*.

The Court finds *Benuzzi* to be distinguishable. In *Benuzzi*, the employee received the disciplinary action for "long forgotten" activities immediately after the employee's protected action. *Id*. Here, Davis received the Corrective Actions shortly after she violated the Hospital's policies. The June 2013 Corrective Action occurred several months after Davis returned from her 2013 FMLA leave. The March 2013 Corrective Action was issued on March 18, 2013, two weeks after Davis secretly recorded her meeting with

Graham and Heard, and three weeks after her return from FMLA leave. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015) ("temporal proximity or suspicious timing alone is rarely sufficient to overcome a motion for summary judgment").  The Court finds that the timing of the March 2013 Corrective Action is not sufficient to overcome summary judgment, given the undisputed evidence that Davis violated Hospital policy by secretly recording the meeting, and lying about it.

Davis also relies upon her confrontation with Heard regarding his assessment of attendance points against her as evidence of the Hospital's retaliation for her FMLA leave.[2]  Davis maintains that when she asked Heard why she had received attendance points for her PTO days, Heard responded, "I told you to stay out of HR. . . .  You've been warned for the last time."  (DE #69-3 at 156.) Davis insists that Heard's statements constitute an admission that he used write-ups like the Corrective Actions to retaliate against her for bringing her job issues, including her reassignment after her FMLA leave, to the Human Resources Department.  In response, the Hospital ignores Heard's alleged statements to Davis.  Instead, the Hospital maintains that the attendance points are not an adverse employment action because Heard told Davis that the points

---

[2] As noted above in the Court's decision on the Hospital's motions to strike (DE #91, DE #93), the Court disregards other evidence proffered by Davis that was not produced before the close of discovery, or is otherwise inadmissible hearsay or not based on personal knowledge.

would be removed from her record, and that they were in fact removed. Considering the evidence in the light most favorable to Davis, the Court finds that Heard's statements creates a triable issue as to whether there is a causal link between Davis's pursuit of her FMLA rights and her assigned positions upon return from FMLA leave. As a result, the Hospital's motion for summary judgment on Count I is **DENIED**.

ADA Failure to Accommodate Claim

Count II of the Complaint alleges that the Hospital violated the ADA by reassigning Davis to a position that required walking, pushing, and lifting, and by denying her request to be reassigned to her pre-surgical position or a position where she could elevate her leg.[3] Under the ADA, as amended by the ADA Amendments Act of 2008, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability" who is an

---

[3] The Hospital argues that the Complaint fails to assert a failure to accommodate claim under the ADA, and thus, Davis has waived this claim. (DE #68 at 4-5.) The Court disagrees because the Complaint alleges that Davis requested reassignment because her assignment caused her knee to swell, and that the Hospital refused her request. The Hospital also maintains that the Complaint fails to allege a claim based on a hostile work environment. Davis appears to concede this point, as she fails to reply to this argument, and thereby, waives any hostile work environment claim. *See Johnson v. Gen. Bd. of Pens. & Health Benefits of United Methodist Church*, 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived).

employee, unless the employer can "demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Sears, Roebuck & Co.,* 417 F.3d at 797 (citation omitted). The parties do not dispute that Davis is a qualified individual with a disability, or that the Hospital was aware that Davis had a disability related to her knees. The parties dispute whether the Hospital reasonably accommodated Davis's disability.

"[T]he ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation. If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Id.* (internal citations and quotation marks omitted). An employee must clarify the extent of her medical restrictions in order to impose liability on the employer for its failure to provide a reasonable accommodation. *Hoppe v. Lewis Univ.,* 692 F.3d 833, 840 (7th Cir. 2012). A reasonable accommodation occurs when "the employer does what is necessary to allow the employee to work in reasonable comfort." *Id.* "An employer need only provide a

qualified individual with a reasonable accommodation, not the
accommodation the employee would prefer." *Id*. (citation, internal
quotation marks and brackets omitted).

Davis admits that the Hospital initiated the interactive
process when she returned to work on February 27, 2013, but insists
that Heard caused problems with that process.  Davis maintains
that Heard refused to assign her to position 15, insisted that
there were no "light duty" positions in the Security Department,
and knowingly assigned her to positions that aggravated her still-
healing knee.  The Hospital maintains that it has no "light duty"
program in the Security Department.  Davis asserts that a
reasonable jury could conclude that position 15 and the Command
Center position were proof that "light duty" positions existed in
that Department.  But "even if 'light duty' would have been
[Davis's] preferred accommodation, the ADA does not entitle a
disabled employee to the accommodation of [her] choice.  Rather,
the law entitles [her] to a reasonable accommodation in view of
[her] limitations and [her] employer's needs." *Swanson v. Vill.
of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015).

It is undisputed that Davis was assigned to position 8 on her
first work day after her 2013 FMLA leave.  That day, Davis
presented a doctor's note stating that she was sufficiently
recovered to resume a normal workload, and a fitness for duty
certificate providing that she could perform all functions of her

job.  Davis attests that she worked in position 8 though her knee
started swelling, and kept pressing to be assigned to position 15.
Davis was assigned to relief position B2 for one day, which did
not cause her problems.  She then was assigned to a seated position
for the first week of March 2013.  At the March 6, 2013,
accommodation meeting, Davis confirmed that she was able to return
to work without restrictions and perform the essential functions
of her position, and requested to be reassigned to position 15.
After this accommodation meeting, Davis was assigned mostly to
seated positions in March, April, May, June and July, with the
exception of five days at relief position B2 in May and June.
Davis worked at position 8 on July 11, which she testified was
"not as bad" because she relieved someone at his post.

In mid-July 2013, Davis submitted a doctor's note to the
Hospital stating that she needs a table and to keep her feet flat
on the floor.[4]  The Hospital called an accommodation conference on
July 25, 2013, at which time Davis indicated that she was able to
perform all job functions, and requested a desk and chair at her
assigned seated positons.  The Hospital agreed and replaced stools

---

[4] While the Complaint alleges that Davis's disability required that she elevate
her leg, it is undisputed that Davis never presented the Hospital with a doctor's
note indicating that she needed to elevate her leg.  Davis does not respond to
the Hospital's argument regarding this alleged medical restriction.  As a
result, Davis has waived any argument that the Hospital failed to reasonably
accommodate this particular medical restriction.  *See Johnson,* 733 F.3d at 729
(holding that arguments not raised in opposition to a motion for summary
judgment are waived).

and podiums with desks and chairs at positions 5 and 6.  Davis was not assigned to those positions until the accommodations were in place.  Thereafter, Davis continued to be assigned mostly to seated positions.  Even taking these facts in the light most favorable to Davis, it is undisputed that the Hospital engaged in the interactive process with Davis regarding her known disability and need for reasonable accommodation.  While Davis would have preferred to work at position 15, the Hospital need only provide Davis with "a reasonable accommodation, not the accommodation [she] would prefer."  *Hoppe,* 692 F.3d at 840.

Davis relies on Heard's alleged statements that Officers were not allowed to work with restrictions as evidence of the Hospital's failure to reasonably accommodate her disability.  A policy that requires "all employees to return to work without medical restrictions" may be referred to as a "100% healed policy." *Mazzacone v. Tyson Fresh Meats, Inc*., No. 3:13-CV-897, 2016 WL 3876903, at *5 (N.D. Ind. Jul. 18, 2016).  A 100% healed policy constitutes a *per se* violation of the ADA because it "prevents individual assessment . . . [and] necessarily operates to exclude disabled people that are qualified to work."  *Steffen v. Donahoe*, 680 F.3d 738, 748 (7th Cir. 2012) (citing *Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011)).  However, Davis must provide evidence that the Hospital applied a 100% healed policy during the time period at issue.  *See Powers*, 667 F.3d at 823 n.8

("Powers presented sufficient evidence that Holland *applied* a 100% healed policy") (emphasis added).  Summary judgment is appropriate where a plaintiff does not proffer evidence that would permit a jury to conclude that the employer "eschewed an individual assessment in favor of a 100% healed policy." *Mazzacone*, 2016 WL 3876903, at *6.

Davis attests that Heard told her that if she had any restrictions, he did not have a job for her, and proffers a memorandum of an EEOC onsite visit which notes that Heard stated, "no one can return to work with restrictions," and "employees must return with no restrictions," during an interview with the EEOC investigator.  (DE #81-8 at 1.)  But even considering this evidence in the light most favorable to Davis, she proffers no evidence from which a jury could conclude that the Hospital applied this type of policy to Davis and required her to be fully healed prior to returning to work.  *See Mazzacone*, 2016 WL 3876903, at *5-*6.  It is undisputed that Davis returned to work after her 2013 FMLA leave, and that the Hospital held accommodation meetings for Davis, assigned her mostly to seated positions thereafter, and made other reasonable accommodations to allow Davis to work in those positions, including replacing podiums and stools with desks and chairs to accommodate her disability.  For these reasons, the Court **GRANTS** the Hospital's motion for summary judgment as to Count II.

ADA Retaliation Claim

Count III of the Complaint alleges that the Hospital retaliated against Davis in violation of the ADA. "The ADA prohibits employers from retaliating against employees who assert their right under the act to be free from discrimination." *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012) (citing 42 U.S.C. § 12203(a)). "Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless." *Id.* (citation omitted). A plaintiff can establish retaliation under the ADA through either the direct or indirect method of proof. *Preddie,* 799 F.3d at 814. As with her FMLA retaliation claim, Davis seeks to prove her ADA retaliation claim using the direct method. The direct method of proof requires Davis to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Id.* The parties do not dispute that Davis engaged in statutorily protected activity when she asked for reasonable accommodations and filed EEOC charges.

The Hospital asserts that Davis fails to demonstrate that she was subjected to an adverse employment action. "Adverse employment actions are actions that would dissuade a reasonable person from engaging in a protected activity." *Dooley v. Abbott Labs.,* No. 07 C 7249, 2009 WL 1033600, at *9 (N.D. Ill. Apr. 17, 2009) (citation

omitted).   Davis maintains that she suffered adverse employment actions when she was denied assignment to position 15, and when received the March 2013 Corrective Action and the June 2013 Corrective Action.   She admits that write-ups may not normally be an adverse employment action.   *See, e.g., Arive v. Essilor Labs. of Am., Inc.,* No. 1:04 CV 0099 DFH WTL, 2006 WL 839467, at *6 (S.D. Ind. Mar. 30, 2006) ("A written reprimand generally is not considered an adverse employment action unless it carries with it some concrete effect on an employee's position, pay, benefits, or prospects with the employer.") (citations omitted).   For the reasons provided above, there is a genuine issue of fact as to whether Davis's reassignment constitutes an adverse employment action.   *See also Flanagan v. Office of Chief Judge of Circuit Court of Cook Cty., Ill.,* No. 06 C 1462, 2007 WL 2875726, at *10 (N.D. Ill. Sept. 28, 2007) (finding it reasonable to conclude that reassignment to desk duty was retaliatory where plaintiff proffered evidence that it was a form of discipline).   The June 2013 Corrective Action resulted in a three-day suspension, and is undisputedly an adverse employment action.   (*See* DE #68 at 13.) Davis does not demonstrate that the March 2013 Corrective Action resulted in a concrete effect on her position.

Davis insists that her ADA retaliation claim is based on "more" than just these actions.   In *Bob-Maunuel v. Chipotle Mexican Grill, Inc.,* 10 F. Supp. 3d 854 (N.D. Ill. 2014), the plaintiff's

managers, who were aware that the plaintiff had filed an EEOC Charge, increased their monitoring of the plaintiff's performance and increased the frequency in which they documented his alleged deficiencies, which was allegedly done in an effort to terminate him. *Id.* at 886. The court held that "the pronounced increase in negative reviews and the careful scrutiny of plaintiff's performance, coupled with testimony suggesting that management personnel were acutely aware of plaintiff's EEOC charge, is sufficient to establish a causal link for plaintiff's *prima facie* case of retaliatory discharge." *Id.* (citation omitted). The court found that the evidence was sufficient to establish a causal link between the plaintiff's internal complaints and EEOC Charge and his termination. *Id.*

As with her FMLA retaliation claim, Davis relies on her confrontation with Heard over attendance points to demonstrate a causal link between her requests for accommodation and her assignment to other positions and the Corrective Actions.[5] It is undisputed that Heard was aware of Davis's disability, as well as her requests to be accommodated by being assigned to position 15 or an equivalent position. When Davis asked Heard why he had assessed her attendance points for absenteeism in February 2014, he told her that he had warned her for the last time about going

---

[5] As explained in footnote 2, the Court disregards evidence proffered by Davis that has been stricken.

to Human Resources, presumably to raise her ADA and FMLA issues. This evidence would permit a reasonable factfinder find a causal connection between Davis's pursuit of her ADA rights and her reassignment and/or the June 2013 Corrective Action. Therefore, the Court **DENIES** the Hospital's motion for summary judgment on Count III.

CONCLUSION

For the reasons set forth above, "Defendant's Motion for Summary Judgment" (DE #67) is **GRANTED IN PART** and **DENIED IN PART,** "Defendant's Motion to Strike Portions of Plaintiff's Evidence, Statement of Genuine Disputes and Plaintiff's Affidavit from Plaintiff's Response to Defendant's Motion for Summary Judgment" (DE #91) is **DENIED**, "Defendant's Motion to Strike Portions of Plaintiff's Evidence based upon Failure to Disclose during Discovery" (DE #93) is **GRANTED IN PART** and **DENIED IN PART,** and the "Stipulated Motion to Apply the Legal Standards Set Forth in *Ortiz vs. Werner* to the Parties' Pending Summary Judgment Pleadings and Evidence" (DE #98) is **GRANTED.** Count II of the First Amended Complaint is hereby **DISMISSED.**


DATED:  September 30, 2016           /s/ RUDY LOZANO, Judge
                                     **United States District Court**